■ Dylan Loper, an Infant, by Susan M. Loper, et al., His Parents and Guardians, et al., Plaintiffs, and Cody Anderson, an Infant, by Robin Anderson, His Parent and Guardian, et al., Respondents, v Clifford Dennie et al., Defendants, and Mark D. Anderson et al., Appellants. [807 NYS2d 672]—

Lahtinen, J. Appeal from that part of an order of the Supreme Court (O'Brien, III, J.), entered October 8, 2004 in Madison County, which denied a motion by defendants Mark D. Anderson and Vicky L. Anderson for summary judgment dismissing the complaint against them.

In this appeal, the landlords of property where an infant was attacked by a dog owned by the tenants seek dismissal of the action against them. This lawsuit, while brought as a single action, involves two separate dog bite incidents on unrelated infants, as well as different dog owners and different landlords. The common factor is that the same Rottweiler carried out both attacks. In April 1998, when the dog was owned by defendants Susan Dennie and Clifford Dennie (who resided in a rental home owned by the Van Dusen defendants), the dog attacked three-year-old plaintiff Dylan Loper, biting the child in the face. Shortly thereafter, the Dennies gave the dog to defendants Donald Harp and Tina Harp. The Harps claim that they had no knowledge of the prior incident, a fact disputed by the Dennies. The Harps moved into a home they rented from defendants Mark D. Anderson and Vicky L. Anderson (hereinafter collectively referred to as defendants) in August 1998. On October 19, 1998, the dog viciously attacked four-year-old plaintiff Cody Anderson, biting and holding onto the child's face while shaking the boy's body "like a rag doll." Cody suffered severe injuries to his face. Cody and his mother, plaintiff Robin Anderson (hereinafter collectively referred to as plaintiffs), along with the Loper plaintiffs, commenced this action and, following disclosure, defendants and the Van Dusen defendants moved separately for summary judgment dismissing the complaint as to each of them. Supreme Court denied the motions. Only defendants appeal.

"A landlord may be liable for the attack by a dog kept by a tenant if the landlord has actual or constructive knowledge of the animal's vicious propensities and maintains sufficient control over the premises to require the animal to be removed or confined" (*Smedley v Ellinwood*, 21 AD3d 676, 676 [2005] [citations omitted]; *see Strunk v Zoltanski*, 62 NY2d 572, 575 [1984]). Vicious propensities can, of course, be established by prior similar aggressive acts by the animal. Other factors that

potentially provide notice of vicious propensities include a dog "known to growl, snap or bare its teeth," "the manner in which the dog [is] restrained," and whether the dog is kept as a guard dog (*Collier v Zambito*, 1 NY3d 444, 446-447 [2004]). The breed of the dog, although not sufficient to raise a question without further evidence, can be considered in the overall analysis (*see Mulhern v Chai Mgt.*, 309 AD2d 995, 997 [2003], *lv denied* 1 NY3d 508 [2004]; *Sorel v Iacobucci*, 221 AD2d 852, 853-854 [1995]; *Wilson v Bruce*, 198 AD2d 664, 665 [1993], *lv denied* 83 NY2d 752 [1994]).

Here, although the dog had previously attacked another child in April 1998, there is no evidence that defendants had any knowledge of that attack. Nevertheless, the evidence produced by plaintiffs included an affidavit from the postal carrier who delivered mail to the premises from August 1998 to October 1998. He stated that "[t]he large rottweiler was kept on a tether line" and that "[e]ach time I would approach the house . . . , the dog would immediately begin to bark in an aggressive manner." He recalled that "[t]he dog would also tug and pull aggressively at its leash in an attempt to come at me," and added, "I believe that if the rottweiler dog was not tied down, it would have attacked me." Defendants admitted visiting the premises two to three times between August 1998 and October 1998, and Donald Harp indicated that defendants may have been there more frequently. Defendants undisputedly knew of the dog's presence and had observed the dog. In fact, they were aware that the dog was a Rottweiler, a breed they acknowledged could be "mean" and serve as a guard dog. Mark Anderson had discussed with Donald Harp the fact that the presence of a dog might cause the insurance to increase. Vicky Anderson had expressed concern to Tina Harp about how the dog might behave around children. Robin Anderson stated that Vicky Anderson related to her in a telephone conversation shortly after the incident that "she had told the [Harps] that they weren't to have that dog at their house." All these facts, viewed cumulatively and in the light most favorable to plaintiffs, are sufficient to preclude judgment as a matter of law as to whether defendants had constructive knowledge of the dog's vicious propensities (*see Baisi v Gonzalez*, 286 AD2d 313, 313-314 [2001] [dissenting op], *revd* 97 NY2d 694 [2002]; *see also Coole-Mayhew v Timm*, 18 AD3d 948, 949-950 [2005]; *Morse v Colombo*, 8 AD3d 808, 809 [2004]).

On the issue of whether defendants maintained sufficient control over the premises to implicate liability, we note that there was no written agreement between defendants and the

Harps regarding the premises, defendants and the Harps ostensibly did not adhere to the informal understanding that reportedly existed, and defendants and the Harps are related. Under these circumstances, and at this procedural point in the litigation, "defendant[s] arguably maintained sufficient dominion over the premises to justify the imposition of liability" (*Wilson v Bruce, supra* at 664).

Peters, Mugglin and Rose, JJ., concur.

Crew III, J.P. (dissenting). I respectfully dissent. While somewhat loath to do so, I must relate the evidentiary facts in some detail to explain my disagreement with the majority. The majority concedes that there is absolutely no evidence that defendants Mark D. Anderson and Vicky L. Anderson (hereinafter collectively referred to as defendants) had any knowledge of the prior attack, but places considerable emphasis on the fact that a postal carrier observed the dog on a tether and that each time the postal carrier approached the house, the dog would bark in an aggressive manner. It is first important to point out that a dog who jumps on a fence in an owner's yard and barks and growls at passersby does not, by itself, evince vicious propensities (*see Collier v Zambito*, 1 NY3d 444, 447 [2004]). More importantly, however, even assuming that the dog's conduct here was sufficient to put the postal carrier on notice of its purported vicious propensities, there is absolutely nothing in the record to suggest that this alleged aggressiveness ever was called to the attention of defendants, who, admittedly, only visited the property a few times prior to the attack at issue. Further, the postal carrier's knowledge cannot be imputed to defendants (*see Smedley v Ellinwood*, 21 AD3d 676 [2005]). Finally, Mark Anderson testified that on the occasions he saw the dog prior to the attack, the dog barked a little, but wagged his tail and appeared to be pretty friendly.

The majority also makes much of Mark Anderson's statement to defendant Donald Harp that he was concerned that the dog's presence might cause his insurance to increase, drawing the inference, I assume, that this indicated a knowledge of the dog's vicious propensities. This, to my way of thinking, is a bit of a leap. Mark Anderson simply advised Harp that if his insurance premium increased as a result of the dog's presence, Harp would have to pay the increase. Mark Anderson further testified that he advised his insurance carrier of the dog's presence but did not recall if the premium actually increased. On this point, there is absolutely no evidence that Mark Anderson was worried about an insurance premium increase because of the dog's alleged viciousness. Indeed, Harp testified that Mark Anderson's

concern with regard to a possible increase in premium stemmed from the breed and size of the dog.

Next, the majority notes that Vicky Anderson expressed concern about how the dog might behave around children, a quite proper concern, in my view, but one that is in no way probative of her knowledge of the dog's allegedly vicious propensities. In any event, she was told that the dog was fine with kids and testified that she saw the dog playing with kids and saw absolutely no aggression—the kids "were petting him, playing with him." While it is true that Mark Anderson testified that he had heard from television that Rottweilers could be "pretty mean" and that Vicky Anderson knew that Rottweilers sometimes were used as guard dogs, that testimony has nothing to do with the propensities of the dog at issue and defendants' awareness thereof.

Finally, as the majority points out, "breed alone is insufficient to raise a question of fact as to vicious propensities" (*Palleschi v Granger*, 13 AD3d 871, 872 [2004]). Indeed, "there is no persuasive authority for the proposition that a court should take judicial notice of the ferocity of any particular type or breed of domestic animal" (*Roupp v Conrad*, 287 AD2d 937, 938 [2001]). And while it has been said that a dog's breed can be considered in the overall analysis of vicious propensity and knowledge thereof, here there is not one iota of evidence, direct or circumstantial, that indicates that defendants knew or should have known of this dog's allegedly vicious propensities, and consideration of the dog's breed therefore becomes superfluous.

Ordered that the order is affirmed, with costs.